RECEIVED

NOV 2 1 2012
AT 8:30_____M
WILLIAM T. WALSH
CLERK

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MICHAEL PAUL MCDANIEL, | : | Civil No. 12-3834 (AET) |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM OPINION** |
| GARY M. LANIGAN et al., | : | |
| Defendants. | : | |

This matter comes before this Court upon Plaintiff's submission of his amended civil complaint ("Amended Complaint"), see Docket Entry No. 10, which was followed by his motion for appointment of pro bono counsel and his application seeking this Court's recusal. See Docket Entries Nos. 14 and 15. For the reasons detailed below, Plaintiff's Amended Complaint will be dismissed, and Plaintiff will be allowed one final opportunity to amend his pleading. Plaintiff's application seeking appointment of pro bono counsel will be denied, as premature at this juncture; such denial will be without prejudice to renewal. Plaintiff's application seeking this Court's recusal will be denied, as meritless.

## I.   BACKGROUND

Plaintiff appears to be a recreational litigant who: (a) instituted a multitude of civil actions in this District; (b) attempted removal of his state criminal prosecution to the District; and (c) had numerous state civil proceedings instituted in state fora removed to this District by defendants named in those removed actions. See, e.g., McDaniel v. Devon Brown, Civil Action No. 05-4817 (AET); McDaniel v. New Jersey State Parole Board, Civil Action No. 07-3205

(MLC); McDaniel v. NJ DOC, Civil Action No. 08-0239 (JAG); McDaniel v. New Jersey State

Parole Board, Civil Action No. 08-0978 (JAP); McDaniel v. Warden Power, Civil Action No.

08-3221 (SDW); McDaniel v. State of New Jersey, Civil Action No. 08-4371 (MLC); McDaniel

v. Hott, Civil Action No. 09-2644 (DRD);  McDaniel v. New Jersey State Parole Board, Civil

Action No. 10-2899 (MLC); New Jersey v. McDaniel, Civil Action No. 10-5372 (MLC);

McDaniel v. Attorney General of the State of New Jersey, Civil Action No. 10-5443 (MLC);

McDaniel v. State of New Jersey, Civil Action No. 11-0267 (MLC); McDaniel v. Warren, Civil

Action No. 12-2102 (PGS).[1]  The instant action was, too, commenced by Plaintiff in state forum

and properly removed to this District by Defendants.  See Docket Entries Nos. 1 and 1-1 to 1-5.

Shortly after removal, Defendants filed a Rule 11 motion seeking to strike Plaintiff's original

pleading.  See Docket Entry No. 4.  Having that motion fully briefed, the Court granted

Defendants' application and directed Plaintiff to file an amended pleading.  See Docket Entries

Nos. 5 to 9.  Plaintiff's Amended Complaint followed, see Docket Entry No. 10, as well as

aforesaid motions.  See Docket Entries Nos. 10, 14 and 15.[2]

## II.    PLAINTIFF'S ALLEGATIONS

Plaintiff's challenges stated in his Amended Complaint are, unfortunately, quite patchy.

---

[1] The Court's list of Plaintiff's actions in this District is not exhaustive: it merely illustrates Plaintiff's propensity to recreational litigation.  A "recreational litigant" is the "one who engages in litigation as sport and files numerous [submissions] with little regard for substantive law or court rules."  Jones v. Warden of the Stateville Correctional Ctr., 918 F. Supp. 1142, 1153 (N.D. Ill. 1995) (noting that, "[w]hen confronted with [a] recreational plaintiff, courts, to protect themselves and other litigants, have enjoined the filing . . . without leave of court" and citing In re Winslow, 17 F.3d 314 (10th Cir. 1994); In re Burnley, 988 F.2d 1 (4th Cir. 1992); and Mayfield v. Collins, 918 F.2d 560 (5th Cir. 1990)).

[2] Recently, Defendants moved for dismissal of Plaintiff's Amended Complait under Federal Rule of Civil Procedure 12(b)(6).  See Docket Entry no. 16.

The Amended Complaint opens with an assertion that, in November 2011, prison officials: (a) discontinued sale (or discontinued disbursement, or imposed a bar on consumption) of unspecified "tobacco products" to/by inmates confined at the Administrative Segregation Unit; (b) instituted a dollar-amount limitation on the purchases such inmate could make at the facility's commissary; and (c) began regulating, in a certain, unspecified in the Amended Complaint way, a "work pay" and the amount of showers each inmate could take during a certain period of time. See Docket Entry No. 10, at 2.

Following this chain of assertions, the Amended Complaint alleges that Muslim inmates are denied Halal food. See id. Right after making that claim, the Amended Complaint alleges that the meals served to inmates violates the inmates' rights because the food products are, allegedly, not approved by the U.S. Food and Drug Administration agency. See id. The Amended Complaint then switches to asserting that Jewish inmates are served non-kosher milk and, while they are served kosher meals, these meals are not glatt kosher.[3] See id. at 2-

---

[3] "The word kosher is derived from the Hebrew 'kashrut' and means 'fit' or 'ritually correct' according to Jewish dietary laws." Barghout v. Bureau of Kosher Meat & Food Control, 66 F.3d 1337, 1341 (4th Cir. 1995) (citing Ran-Dav's County Kosher, Inc. v. State, 129 N.J. 141, 144 (1992)). Under the Jewish Laws, the term "glatt kosher," technically, means products obtained from animals with smooth or defect-free lungs. However, in modern terminology, the phrase "glatt kosher" is used to imply products processed under "stricter" standards of Kashrut. "There is considerable disagreement over what precepts or tenets truly represent the laws of kashrut. There are differences of opinion concerning the application and interpretation of the laws of kashrut both within Orthodox Judaism and between Orthodox Judaism and other branches of Judaism." Ran-Dav's County Kosher v. New Jersey, 129 N.J. 141, 147 (1992) (citing Herman Wouk, This Is My God (1959), reprinted in The Life of Torah 98-99 (Jacob Neusner ed. 1974); Rabbi Hayim Halevy Donin, To Be a Jew 102-04, 112-19 (1972); Rabbi J. David Bleich, Contemporary Halakic Problems 84-92 (1977)). For example, Orthodox Jews of the Sephardic sect adhere to "glatt" kosher standards that are more stringent than those followed by other Orthodox Jews. See Commack Self-Service Kosher Meats, Inc. v. Weiss, 294 F.3d 415, 426 (2d Cir. N.Y. 2002) (citing Raphael Poliakoff, What Is Glatt Kosher?, Kashrus Newsletter, vol. 1, no. 5). As between different branches of Judaism, "Conservative and Orthodox rabbis

3. Plaintiff's allegations conclude with statements asserting that Jewish inmates are denied an opportunity to obtain "tallits"[4] and they are also prevented from "wearing tzitzit."[5] Id. at 3.

## III. PLAINTIFF'S ALLEGATIONS ARE DEFICIENT

### A. Plaintiff Is Without Standing to Assert *Jus Tertii* Challenges

Under the "next friend" doctrine, standing is allowed to a third person so this third person could file and pursue a claim in court on behalf of someone who is unable to do so on his or her own. The doctrine dates back to the English Habeas Corpus Act of 1679 and provides a narrow exception to the "case or controversy" requirement set forth in the Article III of Constitution. See Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990). The Whitmore Court set out two requirements that should be met by the one seeking to qualify for "next friend" standing: (1) "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf [(s)he]

---

differ sharply on many . . . issues" such as the kosher status of wine, cheese, sturgeon, and swordfish. Id. (citing Mark A. Berman, Kosher Fraud Statutes and the Establishment Clause: Are They Kosher?, 26 Col. J.L. & Soc. Probls. 1, 8 (1992)).

[4] The Amended Complaint does not clarify whether Plaintiff was referring to "Tallit Gadol" or "Tallit Katan," although these are two entirely different prayer shawls, in the sense that they differ in size and shape, and are utilized in different occasions. Indeed, since Tallit is a traditional Jewish prayer shawl, there are two kinds of tallit: (a) "Tallit Gadol," which is a very large shawl worn during prayers (the shawl is so large because it must cover most of the wearer's body, over the clothing; therefore the average size of a Tallit Gadol is at least five feet by two feet, although six feet by three feet are very common); and (b) "Tallit Katan," which is a somewhat smaller but, nonetheless, also a sizable shawl, usually worn at all times under the clothing, as a religious undergarment (but such wearing is, typically, performed in no relation to one's prayer). See <<http://www.bje.org.au/learning/judaism/symbols/tallit.html>>.

[5] Plaintiff's "tzitzit" allegations escape this Court, since both Tallit Gadol and Tallit Katan garments are, necessarily, decorated by fringes referred to as "tzitzit" and, therefore, "tzitzit" cannot be worn without these garments. In other words, a person wearing a tallit necessarily wears tzitzit, while a person wearing only the fringes – without a tallit – makes, perhaps, a certain fashion statement but by no means complies with the Jewish Laws.

seeks to litigate" (and it has been suggested that a "'next friend' must have some significant relationship with the real party in interest"); and (2) "the 'next friend' must provide an adequate explanation — such as inaccessibility, mental incompetence, or other disability — why the real party in interest cannot appear on his own behalf to prosecute the action." Id. at 163-64. Since Witmore, the Supreme Court further elaborated the standing requirements of Article III in terms of a three-part test, i.e., whether the plaintiff can demonstrate an injury in fact that is fairly traceable to the challenged actions of the defendant and likely to be redressed by a favorable judicial decision. See Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 102-103 (1998). However, "the point has always been the same: whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" Id., at 103 n. 5 (quoting Warth v. Seldin, 422 U.S. 490, 508 (1975)); see also, Sprint Communs. Co., L.P. v. APCC Servs., 554 U.S. 269, 301 (2008) (Roberts, J., dissenting) ("The absence of any right to the substantive recovery means that respondents cannot benefit from the judgment they seek and thus lack Article III standing. 'When you got nothing, you got nothing to lose'") (quoting, with correction of grammar, Bob Dylan, Like A Rolling Stone, in On Highway 61, Revisited (Columbia Records 1965)).

Here, Plaintiff raises claims on behalf of Muslim and Jewish inmates, as well as inmates confined in the Administrative Segregation Unit and, seemingly, even the inmates in the prison's general population. However, Plaintiff neither showed his significant relationship to these inmates nor provided the Court with any basis to conclude that those inmates are without capacity to prosecute their own claims. Therefore, Plaintiff is without standing to raise any challenges other than claims based on the wrongs he himself suffered. Hence, his Amended

Complaint is subject to dismissal on this ground, and his re-amended pleading, if filed, must be limited to, and only to, the claims ensuing from the events that caused injury to Plaintiff personally.

**B.     Plaintiff's Challenges Must Comply with Rules 18 and 20**

Rule 20(a)(2) of the Federal Rules of Civil Procedure limits the joinder of defendants, and Rule 18(a), governs the joinder of claims. <u>See</u> Fed. R. Civ. P. 18(a), 20(a)(2).

Specifically, Rule 20(a)(2) provides: "Persons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2)(A) and (B).

Rule 18 (a) provides: "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a). Wright & Miller's treatise on federal civil procedure explains that, where multiple defendants are named, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action. It is not concerned with joinder of claims, which is governed by Rule 18. Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18. . . . Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all . . . .

Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, <u>Federal Practice & Procedure Civil</u> 3d §1655; <u>see also</u> <u>United States v. Mississippi</u>, 380 U.S. 128, 143 (1965) (where county registrars

were alleged to be carrying on activities which were part of a series of transactions or occurrences the validity of which depended upon questions of law or fact common to all of them, joinder of registrars in one suit as defendants was proper under Rule 20(a)); Ross v. Meagan, 638 F. 2d 646, 650 n.5 (3d Cir. 1981), overruled on other grounds by, Neitzke v. Williams, 490 U.S. 319, 328 (1989) (joinder of defendants is not permitted by Rule 20 unless both commonality and same transaction requirements are satisfied).  Consequently, a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact.  See Fed. R. Civ. P. 20(a)(2).  Importantly, challenges by incarcerated individuals are not exempt from the reach of Rules 18 and 20.  See George v. Smith, 507 F. 3d 605, 607 (7th Cir. 2007) ("A buckshot complaint that would be rejected if filed by a free person . . . should be rejected if filed by a prisoner").

Here, Plaintiff asserted a multitude of unrelated events, such as limitations on certain tobacco sale (or disbursement, or consumption), dollar-amount limitations on commissary purchases, limitations on frequency of showers, lack of approval of meals by the U.S. Food and Drug Administration, denial of Halal food to Muslim prisoners, denial of kosher milk and glatt kosher meals to Jewish inmates, bar on wearing tallits, etc.

Plaintiff, however, cannot lump all these challenges in a single pleading.  Accord Murakush Caliphate of Amexem Inc. v. New Jersey, 790 F. Supp. 2d 241, 2011 U.S. Dist. LEXIS 51887, at *69 (D.N.J. May 13, 2011) ("To put the [span of these challenges] in perspective, it is much like [Plaintiff's] version of Leo Tolstoy's 'War and Peace'") (quoting Mann v. GTCR Golder Rauner, L.L.C., 483 F. Supp. 2d 884, 891 (D. Ariz. 2007)).  Rather, he

must select a set of transactionally related events that caused Plaintiff legal injury and then duly join defendants in accordance with Rule 18. Therefore, Plaintiff's Amended Complaint is subject to dismissal for failure to comply with the requirements of Rules 18 and 20.

### C.    Plaintiff's Challenges Must Comply with the Requirements of Rule 8

#### 1.    Standard of Review

Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Moreover, "[w]hile a complaint ... does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing, inter alia, Papasan v. Allain, 478 U.S. 265, 286 (1986), for the observation that courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). The Supreme Court emphasized that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

#### 2.    Free Exercise Challenges

While the Court, at this juncture, cannot establish whether and how Plaintiff's claims – be they based on alleged limitations on certain tobacco sale (or disbursement, or consumption), or on dollar-amount limitations on commissary purchases, limitations on frequency of showers, lack of approval of meals by the U.S. Food and Drug Administration, or on denial of Halal food to Muslim prisoners – might relate to Plaintiff himself, it appears that Plaintiff's assertions as to

Page 8 of 18

alleged denial of kosher milk and glatt kosher meals, and the alleged bar on wearing tallit might

relate to Plaintiff himself, since, in the recent past, Plaintiff adopted an alias "Yehudah Tziyon

Ke'ish Mil'chamot"[6] and even filed the instant matter under said alias.  Therefore, out of

abundance of caution, the Court finds it warranted to detail to Plaintiff the standard governing

First Amendment claims falling within the reach of the Free Exercise Clause.

> Turner v. Safley, 482 U.S. 78 (1987), and Overton v. Bazzetta, 539 U.S. 126
> (2003), contain the basic substantive legal standards governing [such claims.  The
> Supreme] Court recognized in Turner that imprisonment does not automatically
> deprive a prisoner of certain important constitutional protections, including those
> of the First Amendment.  [See Turner,] 482 U.S. at 93; see also O'Lone v. Estate
> of Shabazz, 482 U.S. 342, 348 (1987).  But[,] at the same time[,] the Constitution
> sometimes permits greater restriction of such rights in a prison than it would allow
> elsewhere.  See, e.g., Turner, [482 U.S.] at 84-85.  As Overton . . . pointed out,
> courts owe "substantial deference to the professional judgment of prison
> administrators."  539 U.S. at 132.  And Turner reconciled these principles by
> holding that restrictive prison regulations are permissible if they are "'reasonably
> related' to legitimate penological interests," [Turner,] 482 U.S. at 87 . . . .

Beard v. Banks, 548 U.S. 521, 528 (2006).

The aforesaid Turner analysis is, however, conducted as a second step only, meaning that

such analysis is warranted only if the allegations made by the plaintiff show that his/her beliefs

are: (a) sincerely held; and (b) of religious – rather than other, e.g., gourmet – nature.  See

DeHart v. Horn, 390 F.3d 262 (3d Cir. 2004).  "[T]he fact that prisoners' meals are not elaborate

enough to meet the prisoners' dining preferences cannot serve as the basis for a viable claim."

Love v. N.J. Dep't of Corr., 2011 U.S. Dist. LEXIS 10102, at *74 (D.N.J. Jan. 31, 2011); see also

Tisdale v. Dobbs, 807 F.2d 734 (8th Cir. 1986) (First Amendment rights of Muslim prisoner

were not violated where, after daily religious fast, he was provided with merely a "sack lunch"

---

[6] The alias is, seemingly, intended to imitate a Hebrew phrase, "Praise to a Warrior of Zion."  See The Oxford English-Hebrew Dictionary (1998).

consisting of two bologna sandwiches, since the facts alleged did not suggest that he could not

eat these sandwiches, e.g., because he was vegetarian or because bologna was made of pork

which he could not eat); accord Patel v. United States Bureau of Prisons, 515 F.3d 807 (8th Cir.

2008) (affirming dismissal of an inmate's claims since the inmate did not explain why less

expensive food items prepared in accordance with the inmate's religious beliefs could not serve

as a substitute for kosher meat entrees); Johnson v. Horn, 150 F.3d 276 (3d Cir. 1998) (while

prison officials are required to provide Jewish inmates with "a" kosher diet, service of cold diet

complying with the requirements of kashrut did not violate the inmates' rights), overruled on

other grounds, DeHart, 227 F.3d 47; cf. Kretchmar v. Beard, 241 F. App'x 863 (3d Cir.)

(dismissing an inmate's appeal since the Third Circuit precedent made it clear that inmate's rights

were not violated by fact that he was served non-rotating menu of cold food items in response to

his request for Kosher diet), cert. denied, 552 U.S. 1049 (2007).

Moreover,

[a] mere assertion of a religious belief does not automatically trigger First
Amendment protections . . . . To the contrary, only those beliefs which are both
sincerely held and religious in nature are entitled to constitutional protection. As
[the Court of Appeals] explained in Africa v. Pennsylvania:

The relevant case law in the free exercise area suggests that two threshold
requirements must be met before particular beliefs, alleged to be religious
in nature, are accorded first amendment protection. A court's task is to
decide whether the beliefs avowed are (1) sincerely held, and (2) religious
in nature, in the claimant's scheme of things. [See] United States v. Seeger,
380 U.S. 163, 185 (1965); Callahan v. Woods, 658 F.2d 679 (9th Cir. Oct.
5, 1981). If either of these two requirements is not satisfied, the court
need not reach the question, often quite difficult in the penological setting,
whether a legitimate and reasonably exercised state interest outweighs the
proffered first amendment claim.

662 F.2d 1025, 1029-30 (3d Cir. 1981).

DeHart v. Horn, 227 F.3d at 51-52.

Here, Plaintiff's Amended Complaint is void of any facts suggesting that Plaintiff is a

religious Jew stickily observing the Jewish Laws, including the Laws of Kashrut and that his

religious beliefs are incompatible with consuming non-kosher milk or meals that are not glatt

kosher. See, generally, Docket Entry No. 10. Indeed, at no point the Amended Complaint

averred to Plaintiff's regular attendance of Sabbath prayers and/or to his dedicated celebration of

all Jewish High Holidays, and/or to his use of teffilins,[7] systemic studies of the Torah and/or to

his application to the prison officials for a permission to grow peyos,[8] etc. – the facts which, had

---

[7] The term "tefillin" describes "a set of two small cubic leather boxes, each of which: (a)
contains scrolls of parchment inscribed with verses from the Torah; and (b) has a leather strap
attached." Love, 2011 U.S. Dist. LEXIS 10102, at *108.

> Before the prayer, the "arm-tefillin" is usually placed (or "laid") on the biceps of the arm,
> with the strap wrapped around the arm, hand and fingers; traditionally, the strap should be
> long enough to allow for a knot, plus wrapping around the forearm seven times, and also
> to tie around the hand and fingers according to particular tradition followed. See Isaac
> Klein, A Guide to Jewish Religious Practice 6-9 (1979). Next, . . . the head-tefillin is
> traditionally placed on top of the head, aligned between the worshiper's eyes, with the
> strap (having two sides extending on both sides of the teffilin) tied at the back of the head
> and then brought in front of the shoulders; each of this two straps should, traditionally, be
> rather long, typically long enough the reach the worshiper's navel on the left side and his
> genital area on the right side. See id. These straps ("retzuah") are typically at least 9
> millimeters wide or, preferably, 10 to 11 millimeters in width, and about 1.5 millimeter in
> thickness. See << http://www.stam.net/tefillin_straps.aspx>>. Traditionally, the straps
> are made of leather and intended to be strong, resilient binds. See id.

Id. at *108-09, n. 39.

[8] The term "peyos," spelled alternatively as "payot" or "payoss," refers to one of the
clearly distinguishable physical characteristics of the Torah-observant Jewish males, which is
long curled "side locks" of hair that grow on either side of his head and "fall just in front of the
ears." Walls v. Schriro, 2008 U.S. Dist. LEXIS 14539, at *27, n. 7 (D. Ariz. Feb. 25, 2008); see
The Torah, Vayikra/Leviticus 19:27; accord <<http://www.yutorah.org/lectures/lecture.cfm/
735346/Rabbi_Aryeh_Lebowitz/Halachos_of_Peyos_Harosh>>. Plaintiff's photo, depicted on
his New Jersey Department of Corrections website, shows no peyos. See <<https://www6.state.

they been present and duly asserted in the Amended Complaint, would suggested Plaintiff's

faithful adhesion to Orthodox Judaism. See id. Furthermore, Plaintiff's Amended Complaint

does not suggest he shared his kosher milk, glatt kosher meal or tallit woes with his rabbi (in fact,

the Amended Complaint does not even hint that Plaintiff uses services of an Orthodox Jewish

rabbi). See id. Furthermore, while complaining about the alleged denial of strict kosher diet,

Plaintiff at no point referred to himself as a religious Jew, thus leaving to this Court's

imagination to determine Plaintiff's religious beliefs, if any. See id. Granted the foregoing, this

Court has no basis to presume that Plaintiff's Jewish beliefs are sincere (indeed, as of now, they

appear either non-existing or merely limited to his choice of Hebrew-based alias), or that

Plaintiff's preference for strict kosher meals is of a religious, rather than a purely gourmet (or

sanitary, or in-prison-status, etc.) nature.

To add, Plaintiff's Amended Complaint is wholly silent as to such matters as: (a)

Plaintiff's past requests to his prison officials with regard to accommodation of his religious

beliefs in terms of kosher milk, glatt kosher foods, wearing tallit, etc.; (b) bases asserted by the

prison officials in connection with denying Plaintiff's requests (that is, if such requests were

actually made and, in fact, denied); and (c) other means to worship that Plaintiff has been

allowed, e.g., whether he has ability to perform and/or partake in daily and High Holiday prayers,

obtain guidance from a Jewish rabbi, celebrate Jewish High Holiday rituals (such as reflections

and ceremonial meal traditional to Passover meal, atonement required on Yom Kippur, joyful

praise typical to Hanukkah, etc.), or whether he is allowed to study Jewish Holy Books, be free

from activities that qualify as work under the Jewish Laws during Sabbath and High Holidays.

---

nj.us/DOC_Inmate/details?x=1191799&n=0>>.

Since, at this juncture, the Court has no basis to presume that these acts of worship have

been prohibited to Plaintiff, Plaintiff failed to state a plausible claim, within the meaning of

Iqbal, under the substantive tests articulated in Turner v. Safley and Overton v. Bazzetta.[9] Thus,

even if the Court were to hypothesize that Plaintiff's free exercise challenges related to practice

of Judaism ensued from the events Plaintiff experienced himself, his Amended Complaint shall

be dismissed for failure to state a claim upon which relief can be granted. See Strope v.

Cummings, 381 F. App'x 878 (10th Cir. 2010) ("The complaints . . . reflect the inconvenience of

non-preferred or occasionally unsatisfactory items in a meal. We cannot say that they constituted

a substantial burden on [the inmate's] practice of maintaining a kosher diet. . . . As for his

broader complaints about the variety, quality, and rotation of the menu, such general allegations

are insufficient"); Tisdale v. Dobbs, 807 F.2d 734 (8th Cir. 1986) (First Amendment rights of

Muslim prisoner were not violated where, after daily religious fast, he was provided with a "sack

lunch" consisting of two bologna sandwiches, since the facts alleged did not suggest that he

could not eat these sandwiches, e.g., because he was vegetarian or because bologna was made of

---

[9] Reasonable limitations on religious demands are valid under the First Amendment.
See, e.g., Rogers v. Scurr, 676 F.2d 1211 (8th Cir. 1982) (prison rule preventing inmates from
wearing prayer robes outside of prayer services area does not violate First Amendment rights of
prisoners since the rule is justified by prison policy of prohibiting contraband which could be
easily hidden in such robes); Butler-Bey v. Frey, 811 F.2d 449, 1987 U.S. App. LEXIS 1960 (8th
Cir. Mo. 1987) (prison regulation prohibiting constant wearing of headgear did not violate the
inmate's right to freedom of religion since the regulation was a reasonable security measure);
Abdullah v. Kinnison, 769 F.2d 345 (6th Cir. 1985) (prison directive restricting use of full length
hooded prayer robes to institutional chapel does not violate constitutional rights of inmates, since
it is justified by sound security considerations, which are normally entrusted to the discretion of
prison administrators); see also Willard v. Hobbs, 2009 U.S. Dist. LEXIS 71244 (E.D. Ark. July
23, 2009) (finding that the prison officials clearly had a legitimate penological interest in
prohibiting an inmate to wear a large altar cloth on security grounds and specifically observing
that since such altar cloth were similar to a tallit in the sense that both could be used to cover the
worshiper's head/shoulders and hide one's appearance/ contraband).

pork which he could not eat); see also Patel v. United States Bureau of Prisons, 515 F.3d 807

(8th Cir. 2008) (affirming dismissal of an inmate's claims since the inmate did not explain why

less expensive food items prepared in accordance with the inmate's religious beliefs could not

serve as a substitute for kosher meat entrees); accord Johnson v. Horn, 150 F.3d 276 (3d Cir.

1998) (while prison officials are required to provide Jewish inmates with "a" nutritionally

sufficient kosher diet, service of cold diet did not violate the inmates' rights because they were

not entitled to hot kosher meals), overruled on other grounds, DeHart, 227 F.3d 47; Kretchmar v.

Beard, 241 F. App'x 863 (3d Cir.) (dismissing an inmate's appeal since the Third Circuit

precedent made it clear that inmate's rights were not violated by fact that he was served

non-rotating menu of cold food items in response to his request for Kosher diet), cert. denied,

552 U.S. 1049 (2007).  However, since the Court cannot rule out the possibility that Plaintiff

might cure the shortcomings of his allegations if allowed another opportunity to replead, the

Court will dismiss the Amended Complaint without prejudice.

### D.    Plaintiff's Challenges Cannot Be Based on *Respondeat Superior*

In the event Plaintiff elects to file his re-amended pleading, his challenges must be based

on factual allegations personally implicating each named Defendant.  Supervising officials

cannot be held liable for actions of their subordinates unless the litigant asserts facts showing

these supervisors' personal involvement in the alleged wrongs. See Iqbal, 129 S. Ct. 1937;

Monell v. Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

(1976); Durmer v. O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993).  Indeed, claims against the

supervisors are subject to dismissal to the degree they are based solely on the respondeat superior

theory. See Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (because

respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation – even if it is operation under contract with the state – cannot be held liable for the acts of its employees and agents under those theories).

## IV.    PLAINTIFF'S MOTIONS WILL BE DENIED

### A.    Motion Seeking Recusal is Without Merit

Under 28 U.S.C. § 455(a), "any justice, judge or magistrate [judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Section 455(a) requires judicial recusal "if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge" of his/her interest or bias in a case. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 860 (1988); In re Kensington Intern. Ltd., 368 F.3d 289, 301 (3d Cir. 2004).  In making this determination, the court must consider how the facts would appear to a "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." U.S. v. Jordan, 49 F.3d 152, 156 (5th Cir. 1995); accord Clemens v. United States District Court for the Central District of California, 428 F.3d 1175, 1178 (9th Cir. 2005); Matter of Mason, 916 F.2d 384, 386 (7th Cir. 1990).

"[B]eliefs or opinions which merit recusal must involve an extrajudicial factor," Selkridge v. United of Omaha Life Ins. Co., 360 F.3d 155, 167 (3d Cir. 2004) (internal quotation marks and citation omitted), and the Supreme Court has made it clear that "judicial rulings alone almost never constitute a valid basis" for recusal. Liteky v. United states, 510 U.S. 540, 555 (1994).  The reason for this rule is that judicial decisions "in and of themselves can only in the rarest of circumstances evidence the degree of favoritism or antagonism required" to prove bias.

<u>Id.</u>  Consequently, a judge's prior adverse rulings cannot verify for the bias necessary for recusal under 28 U.S.C. § 455(a).  <u>See, e.g.</u>, <u>Byrne v. Nezhat</u>, 261 F.3d 1075, 1103 (11th Cir. 2001); <u>United States v. Pearson</u>, 203 F.3d 1243, 1277 (10th Cir. 2000); <u>Leslie v. Grupo ICA</u>, 198 F.3d 1152, 1160 (9th Cir. 1999); <u>United States v. Arena</u>, 180 F.3d 380, 398 (2d Cir. 1999); <u>Matter of Hipp, Inc.</u>, 5 F.3d 109, 116 (5th Cir. 1993).  This is true even if the judge consistently made adverse rulings against the party, <u>see</u> <u>McCalden v. California Library Assoc.</u>, 955 F.2d 1214, 1224 (9th Cir. 1990); <u>United States v. Mobile Materials, Inc.</u>, 881 F.2d 866, 877 (10th Cir. 1989), because an adverse decision, even if it is adverse on all issues raised, is not evidence of bias, especially when it is supported by the law and facts.  <u>See</u> <u>Crenshaw v. Hodgson</u>, 24 Fed. App. 619, 621 (7th Cir. 2001) (citing <u>Gleason v. Welborn</u>, 42 F.3d 1107, 1112 (7th Cir. 1994); <u>Byrne</u>, 261 F.3d at 1103).  Finally, it should be noted that, where issues of recusal arise, "a federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified." <u>Laird v. Tatum</u>, 409 U.S. 824, 837 (1972); <u>see also</u> <u>Clemens</u>, 428 F.3d at 1179; <u>Sensley</u>, 385 F.3d at 598-99; <u>Nichols v. Alley</u>, 71 F.3d 347, 351 (10th Cir. 1995).

Here, the record does not support a finding of an extrajudicial factor causing impartiality or any degree of favoritism or antagonism on the part of this Court, so as to make fair judgment in this proceedings unlikely, moreover impossible.  While, eight years ago, this Court denied Plaintiff writ of habeas corpus in Plaintiff's Section 2254 proceedings, <u>see</u> <u>McDaniel v. Brown</u>, Civil Action No. 05-4817 (AET), Docket Entry No. 20, the Court did so after carefully addressing each aspect of Plaintiff's petition and duly examining Plaintiff's multiple motions

filed in that action.[10]  See id., Docket Entries Nos. 2, 3, 19 and 20.  Indeed, this Court's

preservation and careful parceling of Plaintiff's claims asserted in the instant matter, including

the Court's detection and substantive analysis of those Plaintiff's claims that are discernable from

the two rounds of pleading filed thus far, as well as the Court's detailed and careful guidance as

to the procedural requirements, pleading standards and a multitude of substantive tests that

seemed to be implicated by Plaintiff's claims should have persuaded Plaintiff as to this Court's

utmost interest in availing Plaintiff to a full and fair opportunity to litigate his claims.

Therefore, Plaintiff's application for the Court's recusal will be denied.

**B.      Motion Seeking Appointment of _Pro Bono_ Counsel Is Premature**

Indigent persons raising civil rights claims have no absolute constitutional right to

counsel. See Parham v. Johnson, 126 F.3d 454, 456-57 (3d Cir. 1997).  In determining whether

to appoint counsel, a court should consider several factors:

> As a preliminary matter, the plaintiff's claim must have some merit in fact and
> law. . . .  If the district court determines that the plaintiff's claim has some merit,
> then the district court should consider the following factors: (1) the plaintiff's
> ability to present his or her own case; (2) the complexity of the legal issues; (3)
> the degree to which factual investigation will be necessary and the ability of the
> plaintiff to pursue such investigation;  (4) the amount a case is likely to turn on
> credibility determinations; (5) whether the case will require the testimony of
> expert witnesses; (6) whether the plaintiff can attain and afford counsel on his
> own behalf.

Tabron v. Grace, 6 F.3d 147, 155-56, 157 n.5 (3d Cir. 1993), cert. denied, 510 U.S. 1196 (1994).

---

[10]  As noted supra, Plaintiff commenced a multitude of actions in this District and had
many matters commenced in state fora removed to this District.  Although Plaintiff obtained
unfavorable rulings on his claims from Judges Joseph A. Greenaway, Mary L. Cooper, Joel A.
Pisano, Susan D. Wigenton and Peter G. Sheridan, none of these rulings was entered on the basis
of anything but merits and/or procedural aspects of Plaintiff's claims.

Here, Plaintiff did not establish that he is an indigent person; rather, the applicable filing fee was paid by Defendants upon removal of Plaintiff's claims from state forum to this District. See Docket Entry No. 1.  Moreover, even if the Court were to hypothesize that Plaintiff could qualify as an in forma pauperis litigant, Plaintiff's challenges, as asserted thus far, did not state a cognizable claim.  Therefore, in light of the guidance provided in Tabron, appointment of pro bono counsel to Plaintiff is necessarily premature and could be made only if Plaintiff's re-amended pleading states a viable claim.  Correspondingly, Plaintiff's motion for appointment of pro bono counsel will be denied without prejudice to renewal.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff's Amended Complaint, Docket Entry No. 10, will be dismissed.  Such dismissal will be without prejudice to Plaintiff's filing of his second amended complaint executed in accordance with the guidance provided to Plaintiff herein.  Plaintiff's motion seeking appointment of pro bono counsel, Docket Entry No. 14, will be denied without prejudice to renewal.  Plaintiff's application seeking this Court's recusal, Docket Entry No. 15, will be denied for lack of merit.  Defendants' motion seeking dismissal of Plaintiff's Amended Complaint, Docket Entry No. 16, will be dismissed as superfluous at this juncture; such dismissal, however, is without prejudice to renewal in the event Plaintiff files his re-amended complaint and Defendants elect to move for dismissal of the same.

An appropriate Order accompanies this Memorandum Opinion.

**Anne E. Thompson**
**United States District Judge**

Dated: 11/21/12